Bettye Walker YARBROUGH *v.* Clara A. COATS
ET AL

5-5937                                    483 S.W. 2d 194

Opinion delivered July 10, 1972
[Rehearing denied August 28, 1972.]

*Williams & Gardner,* for appellant.

*Laws & Schulze,* for appellee.

Conley Byrd, Justice. This is an action by Bettye Walker Yarbrough, the only surviving heir of A. C. "Jack" Walker, to set aside a deed executed August 20th and delivered to appellees Clara A. Coats and Artie Lee Bernard by Walker as a gift on October 13th before his death on November 12, 1969. For reversal of the Chancellor's decision upholding the deed, Mrs. Yarbrough contends that her father A. C. "Jack" Walker was mentally incompetent at the time and that the deed is void for want of a definite description of the land to be conveyed.

The test of mental competency to execute a deed is stated in *Donaldson* v. *Johnson,* 235 Ark. 348, 359 S.W. 2d 810 (1962), in this language:

"If the maker of a deed, will, or other instrument has sufficient mental capacity to retain in his memory, without prompting, the extent and condition of his property, and to comprehend how he is disposing of it, and to whom, and upon what consideration, then he possesses sufficient mental capacity to execute such instrument. Sufficient mental ability to exercise a reasonable judgment concerning these matters in protecting *his own interest in dealing with another* is all the law requires. If a person has such mental capacity, then, in the absence of fraud, duress, or undue influence, mental weakness, whether produced by old age or through physical infirmities, will not invalidate an instrument executed by him."

The proof shows that Mr. Walker was an eccentric man who retired early in life. He divorced his first wife, the mother of appellant, in 1950, married a second wife, from whom he was shortly divorced, and thereafter lived with different people. He would "pop-in" and abruptly depart from visits with his relatives. In doing so he often carried a milk goat with him. He apparently met Lydia Breckenridge who was looking after him at the time of his death, at an organic food store a number of years ago. He distrusted his daughter's business judgment so much that he had the house in which she lives and for which he paid put in the name of her aunt.

On August 5th he executed a power of attorney to appellant and her mother to execute deeds to a portion of the property involved. Thereafter he left appellant's home and drove to North Carolina to visit appellees. While there on August 20th he acknowledged the deed in question before a notary public but returned to Arkansas with the deed. Sometime in September appellant checked him into the hospital but he left sometime in the night and woke her up in the early morning hours by pulling on her toes. On October 11, 1969, he arranged for his longtime friend and nurse Lydia O. Breckenridge to fly in from California to Hot Springs, Arkansas. About 3:00 a.m. October 12, he and his nurse departed Hot Springs to go to his ranch at Russellville, Arkansas. Monday morning, October 13th, he borrowed Roy Dennis' car and he and his

nurse drove to a bank in Russellville where he got the deed and asked his nurse to mail it to Artie Lee Bernard in North Carolina. After returning from the bank in Russellville he told his nurse that they left Hot Springs just in time because "they're after both of us. If we hadn't gotten out we would have both been killed." While in Russellville they used Roy Dennis' car because Mr. Walker didn't want his car recognized.

Lydia Breckenridge testified that when Mr. Walker was getting around so early to go to the bank, she told him that the bank would not be open to which he replied that while the bank might not be open, he still knew how to get in. When they arrived before banking hours he went in a side door and came back with the deed.

Dr. Richard E. Walters, a psychiatrist, treated Mr. Walker from October 24th to October 31st. He referred to Mr. Walker's "perseverating or overly concentrating on keeping the control of his property." After relating that Walker brought up these statements spontaneously the record shows the following:

"Q. What was this theme?

A. That there was someone, some group of people, that was attempting to take his property away from him; and that he had desired to preserve it by giving it away to some charitable organization. This was not what I would call an organized delusion, in that he did not believe that a specific person or group was plotting to take it away in the terms of the communist party or foreign agents or someone of a bizarre or fantastic nature. It was more of a feeling and a sense and a fear that somehow he would not be able to control his property. I would say it was a borderline delusion.". . .

"Q. Doctor as a result of your examination, did you reach an opinion that is to a reasonable medical certainty as to what his mental condition was at that time?

A. The diagnosis that I made at that time was a non-psychotic—*that is he was not psychotic in terms of frank distortion of reality*—non-psychotic organic brain syndrome due to circulatory disturbance, that is arteriosclerosis."

Other testimony in the record shows that while visiting with the appellees in North Carolina, Mr. Walker carried on normal conversations, located a supply of goat milk and gave his usual advice on investments. In fact Mrs. Coats followed his financial advice and obtained a $1900 short term profit on the purchase of some Federal Reserve notes. Two days after Mrs. Bernard received the deed in the mail, Mr. Walker called to see if she got the deed and advised her to have it recorded.

All parties agree that appellees visited in appellant's home after Mr. Walker got out of the hospital. On those visits Mr. Walker recognized appellees and on one occasion took a $20 bill and sent after some fried chicken to feed them.

When the record is considered under the law set out above, we cannot say that the Chancellor's holding that appellant had failed to show her father's mental incompetency is contrary to a preponderance of the evidence.

We find no merit in appellant's contention that the quit-claim deed is void for want of a definite description. The deed in question recites:

"That I, A. C. (Jack) Walker an unmarried person, Grantor for and in consideration of the sum of One and No/100 Dollars ($1.00) to me cash in hand paid, the receipt of which is hereby acknowledged, do hereby grant, sell, and quitclaim unto Clara A. Coats and Artie Lee Barnard share alike on West Side Grantee, and unto ...h...heirs and assigns forever, the following lands lying in the County of Yell and State of Arkansas, to-wit:

The South Half (S½) of the Northwest Quarter (NW ¼); the North Half (N ½) of the Southwest

Quarter (SW ¼), of Section One (1), Township Five (5) North, Range twenty-one (21) West of the Fifth Principal Meridian, containing one hundred sixty (160) acres, more or less."

As we view the deed, it definitely conveys the land to the appellees. How they may hold the land among themselves is not a controversy before this court.

Affirmed.

BROWN, FOGLEMAN and JONES, JJ., dissent:

JOHN A. FOGLEMAN, Justice, dissenting. If mental competency at the time of the execution of the deed in question were all that was in issue, I could well agree that we could not say that the chancellor's finding was clearly against the preponderance of the evidence. In this case, however, delivery was not made at the time of the execution, and Walker took the deed home with him and made no effort to deliver it until October 13, 1969, nearly two months after its execution. It seems to me that there is an overwhelming preponderance of the evidence to show that Walker was mentally incompetent at the time of the delivery of the deed, and if he was subject to both lucid and irrational intervals, he was certainly in one of the latter at the time of the alleged delivery.

I give little weight to the testimony of appellant, who is certainly an interested party, or that of her mother, Walker's former wife. But when the testimony of disinterested witnesses is placed on the scale with theirs, the preponderance seems so clear that it seems to me to leave little room for dispute.

Roy Dennis, whose wife was a niece of Walker, and who had known him for 18 or 20 years, moved into Walker's house in September 1969. Dennis stated that his association with Walker, after he moved into the house, was close. This witness said that thereafter he had a very close relationship with Walker. Walker and Lydia Breckenridge arrived home from Hot Springs about 5:00 a.m., Sunday. On the following Monday, Walker arranged to

borrow Dennis' automobile and Dennis, having first declined, telling Walker that he was incapable of driving, finally loaned the car upon the condition that Mrs. Breckenridge go along and do the driving. He testified that Walker agreed, saying if Dennis would let him have the car, maybe he could get through and "they" wouldn't catch him. According to Dennis, "they" had been increasingly a part of Walker's conversation over a period of a year, and included people from the Mafia, the President of the United States, the local sheriff, and attorneys in Pope County, who Walker said were trying to get his money and his life. Dennis stated there were times when Walker would talk about nothing else. Dennis said that such a loan of his automobile was made to Walker five or six times after Walker and Mrs. Breckenridge came from Hot Springs, always because Walker said that "they" knew his car and he didn't want "them" to see it.

Dennis also related that before moving into Walker's house he visited Walker one night and saw that Walker had a .22-caliber rifle beside his bed. The witness said he asked Walker why he had a loaded gun at his bedside, and that Walker replied "That's so I can keep them away from me, so they won't kill me."

Mrs. Lydia Breckenridge, a California resident, who was a registered nurse both in Arkansas and California, had lived in Arkansas from 1955 to 1965, when she became acquainted with Walker. At Walker's request she came to Arkansas and stayed with him during the last few weeks of his life. She arrived in Hot Springs on October 11, 1969, and stayed there with Walker until about 3:30 the next morning, Sunday, October 12, when they left because Walker wanted to go to his ranch at Russellville. She said that Walker got up Monday morning wanting to go to the bank, and that, on this occasion, as well as several subsequent ones, she and Walker traveled in Dennis' car because Walker did not want his car to be recognized. After their return from the bank, she stated that Walker told her that they were just in time because "they're after both of us. If we hadn't gotten out we would have both been killed."

Mrs. Breckenridge also testified that she discovered that Walker kept his bathrobe over the bathroom window, and, knowing that in former years he would not even allow a curtain over the window, asked him about this. She stated that he explained "I have got them blocked out now" and cautioned her about standing in the kitchen near the window, saying "Get away from there, they are coming in, they're going to get you right from there." Mrs. Breckenridge said that he had a complex that someone was after him and at one time or another identified "they" or "them" to include attorney Young, Bolton Harris, his wife's brother, his first wife, Winthrop Rockefeller, Mr. Fulbright of Arkansas and the banker with whom he did business. This registered nurse, who was with Walker from the time of her arrival in Hot Springs on October 11, 1969, almost continuously until his death, except for the week he spent in the psychiatric ward in St. Vincent's Hospital, after relating these facts, expressed the opinion that he was never at any time mentally capable of handling his business affairs or transferring his property, because he was not mentally stable for a long enough period of time to conduct any kind of business. She also said that she did not believe Walker knew what he was doing when he gave her the deed to forward to Artie Lee Bernard.

The testimony of Dr. Richard E. Walters, the psychiatrist to whom Walker was referred on October 24, 1969, and who observed Walker during his stay at St. Vincent's Hospital, gave considerable support to the testimony of Mrs. Breckenridge. Walker related to this doctor that there was a non-specific group of people attempting to wrest his property from him, and, even though he did not know any of them by name, had not seen or talked with any of them, claimed to have certain indications that they were plotting to take his property, so he wanted to deed his property as a gift to a children's home, in spite of his daughter's determination to preserve the property for herself. Walters did not recall Walker's ever mentioning any recent disposition of any of his property, and said that he did not mention that he had executed a deed to two relatives in North Carolina. This witness did remember that Walker wanted his daughter to get hold of some deed to some property and bring it to the hospital. Dr. Walters

found a slowing and sluggishness of Walker's mental and physical activity and stated that, on each visit, whenever left to spontaneous conversation, without specific questions, Walker repeatedly returned to the theme that some group of people was attempting to take his property from him and that he desired to preserve it by giving it to some charitable organization. The physician said that the fear was pretty constant and classified this as a "borderline" delusion. Later he added that if there were no forces trying to get Walker's property, this belief was a delusion. He stated that Walker was extremely emaciated, that if Walker had been able to drive his car to North Carolina and back in August, his condition was much better than it was in October and did not feel that Walker could have deteriorated physically without also having done so mentally. The condition, according to the doctor, was a direct result of organic changes. The diagnosis was nonpsychotic (in terms of frank distortion of reality) organic brain syndrome due to arteriosclerosis. The doctor explained that Walker's arteriosclerotic brain disease was such that there were periods of lucidity but very sudden shifts of mental operation, which could very suddenly alter his functions in terms of being oriented and especially his judgment. Dr. Walters testified that at the times Walker would tell someone that "they" were trying to get his property, he would not consider Walker functioning at his normal level, and would have a "high question" about his mental state at such a time. He found Walker's mental operations always clouded, at best, so that, even when functioning at his best, his judgment was not clear.

Other significant testimony was given by Dr. Roy I. Millard, who had known and treated Walker from 1929 until about 1964. Dr. Millard had formed the opinion that Walker was deteriorating from observing Walker's action the last few times he had seen him. It should also be noted that appellant never attempted to act under the authority of a power of attorney to sell some land that Walker gave her and her mother on August 5, 1969. She explained that she was of the opinion that he did not know what he was doing at the time.

I doubt if this court has ever before sustained a deed in

the face of such strong evidence of a lack of mental capacity at the very moment of action by the grantor. On the other hand, we have reversed the decree of a trial court on a finding of mental capacity upon no more convincing evidence of incompetency than is before us here. In *McEvoy v. Tucker,* 115 Ark. 430, 171 S.W. 888, we reversed a finding that the grantor's deed was valid, because the preponderance of the evidence was that for a few months prior to the execution of the deed and particularly during the month of the execution, the grantor was incapable of exercising rational judgment about such matters, that he had gradually deteriorated mentally and physically, growing worse all the time until his death. There was evidence there that one talking to the grantor casually might not notice his condition and that he might have seemed to a stranger to have retained his faculties. There is such a close parallel between that case and this that it should govern our action here.

I would reverse the decree of the chancery court, because I think that appellant's burden of proving lack of mental capacity of Walker to make an effective delivery of the deed was met not only by a clear preponderance of the evidence, but also by evidence so clear and convincing as to leave no reasonable doubt.

I am authorized to state that Mr. Justice Brown and Mr. Justice Jones join in this dissent.